UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| PAUL MAZZIE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 2:04CV0081 AGF |
| ) | |
| CORRECTIONAL MEDICAL ) | |
| SERVICES, INC., DR. GREGORY ) | |
| RAKESTRAW, and DR. BENJAMIN ) | |
| GADDY, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court[1] on two motions for summary judgment filed by Defendants. Plaintiff Paul Mazzie, a Missouri inmate, filed this action under 42 U.S.C. § 1983 on November 4, 2004, claiming that while he was incarcerated at the Northeast Correctional Center ("NECC"), Defendant Benjamin Rakestraw, who was the Medical Director at the prison, and Defendant Benjamin Gaddy, another doctor at the prison, violated Plaintiff's constitutional rights by failing to provide him with adequate medical care for various impairments.[2] The record indicates that Plaintiff was at NECC from July 24, 2002, until December 12, 2005, when he was transferred to another correctional facility in Missouri.

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

[2] Defendant Correctional Medical Services has been dismissed by Order dated May 23, 2005. (Doc. #26.)

In ruling on these Defendants' earlier joint motion for summary judgment, the Court concluded that they were entitled to judgment on all of Plaintiff's claims except his claims that he was not provided with planned surgeries for torn rotator cuffs and for abdominal problems. (Doc. #58.) For the reasons set forth below, Defendants' new motions for summary judgment shall be granted.

## BACKGROUND

The record establishes that Plaintiff, who was born on April 20, 1936, had numerous medical conditions while at NECC, including problems with his left hip, which had been replaced with a prosthetic hip a few years before he entered NECC, and which caused him to need a wheelchair; shoulder injuries, bilaterally, caused by utilization of the wheelchair (and crutches); an abdominal condition which Plaintiff believed was a hernia; diabetes affecting his feet and toes; high blood pressure; and heart disease. In ruling on Defendants' previous motion for summary judgment, the Court noted that the prison medical records submitted by the parties indicated that Plaintiff had been cleared by outside consultants in August 2003 for abdominal surgery, and in November 2003 for surgical repair of his rotator cuffs. Yet these procedures were not performed while Plaintiff was at NECC. (Doc. #58.)

In their earlier summary judgment submission, Defendants did not deny that Plaintiff had these two medical conditions, that they caused Plaintiff pain, or that he had been medically cleared for the surgeries. Defendants simply asserted, in a single sentence in their motion for summary judgment, that they decided that Plaintiff did not need these operations. Defendants provided no evidence to support this assertion, such as their own

2

affidavits attesting to the bases of their decisions. On that record, Defendants had not met their burden to demonstrate that they were entitled to summary judgment with regard to these matters.

Upon issuing its Memorandum and Order on the prior motion, the Court appointed counsel to represent Plaintiff. Following the appointment of counsel, the parties proposed, and the court adopted, an amended case management order that included new deadlines for conducting additional discovery, naming experts and filing case dispositive motions. Defendants have now filed two motions for summary judgment, one by Dr. Rakestraw related to Plaintiff's shoulder injuries, and one by both Drs. Rakestraw and Gaddy related to the abdominal condition. In support of Dr. Rakestraw's motion for summary judgment with respect to the failure to surgically repair Plaintiff's rotator cuffs, Dr. Rakestraw submits his deposition testimony, taken on June 6, 2007, in which he testified that on March 4, 2003, he sent Plaintiff to be seen by orthopedic consultant Timothy Galbraith, M.D., for evaluation of bilateral shoulder injury, worse on the right side.

Dr. Rakestraw testified that Dr. Galbraith told him that Plaintiff's shoulders were not a major issue and that surgery should not be done until the hip problem was resolved and Plaintiff was ambulatory. Dr. Rakestraw testified that in his professional opinion, Plaintiff's "left hip never got to a point, not even close to getting to a point of rehabilitation to meet Dr. Galbraith's expectations to repair his right shoulder." Dr. Rakestraw testified that, accordingly, he did not send Plaintiff back to Dr. Galbraith, but concentrated on taking care of Plaintiff's other medical needs, which were significant and

more serious. Dr. Rakestraw testified that, in addition, "at an early point, [Plaintiff] stopped complaining about his shoulder" while he continued to complain about other medical needs. (Def. Ex. K at 119-20 to Doc. #93.)

Plaintiff's prison medical records show that Plaintiff was seen by Dr. Rakestraw on November 7, 2002, for pain in Plaintiff's shoulders, initially felt while he was maneuvering his wheelchair uphill. Diagnostic testing indicated tendinitis with a possible tendon tear. Consistent with Dr. Rakestraw's testimony, the records reflect that Plaintiff was referred to Dr. Galbraith, whom Plaintiff saw on March 4, 2003. Dr. Galbraith reported that the diagnostic tests showed a "questionable tear" of the right rotator cuff, with definite signs of "outlet impingement." Dr. Galbraith believed that part of Plaintiff's problem was overuse of the right shoulder in dealing with crutches and the wheelchair. Dr. Galbraith recommended evaluating Plaintiff's hip first, and then considering the shoulder problem. Meanwhile, he recommended rehabilitation to strengthen the cuff, no overhead lifting, and return for follow-up in six weeks. (Pl. Ex. C at 5 to Doc. #96.)

On May 5, 2003, Plaintiff was seen by orthopedic surgeon Thomas Kramer, M.D., with regard to Plaintiff's shoulder injuries. Dr. Kramer stated that Plaintiff needed a cardiac evaluation prior to any recommendation for surgery. (Def. Ex. E to Doc. #73.) On June 12, 2003, Plaintiff underwent a stress test. Id. On October 14, 2003, Plaintiff was seen by orthopedist Richard Turnbaugh, M.D., for left hip pain. On November 25, 2003, Dr. Turnbaugh reported that Plaintiff was "OK to have shoulder surgery." (Def. Ex. M to Doc. #94.) Dr. Turnbaugh continued to see Plaintiff for hip pain. Testing indicated that there was no problem with the prosthetic hip. Dr. Turnbaugh noted some bursitis,

4

and recommended physical therapy, which Plaintiff received in January and February 2004. Some improvement was reported, and on February 24, 2004, the physical therapist noted that new orders were needed for continued therapy twice a week for two weeks. (Def. Ex. C at 4). Such orders were apparently not issued.

On March 19, 2004, Dr. Turnbaugh reported that he could not find the etiology of Plaintiff's continued hip pain and he referred Plaintiff to another physician. (Def. Ex. M.) It is undisputed that shoulder surgery was never performed. Plaintiff's shoulder problems were not mentioned in subsequent requests for medical services that he submitted to prison officials, or in subsequent physicians' progress notes related to other conditions.

With respect to the failure to surgically correct Plaintiff's abdominal condition, Plaintiff's prison medical records indicate that on April 7, 2003, Dr. Rakestraw examined Plaintiff, who thought that he had an abdominal hernia and who complained "bitterly of pain." Dr. Rakestraw noted that pursuant to his examination, he was not sure that Plaintiff had a hernia, and so he referred Plaintiff to Dr. Gaddy, a surgeon, for evaluation. (Def. Ex. E.) As noted above, on May 5, 2003, Plaintiff was seen by orthopedic surgeon Dr. Kramer, who stated that Plaintiff needed a cardiac evaluation prior to any recommendation for surgery. In so stating, Dr. Kramer noted that Plaintiff was to see Dr. Gaddy. Id.

On July 30, 2003, Dr. Rakestraw again referred Plaintiff to Dr. Gaddy, this time noting that Plaintiff had a "significant abdominal wall hernia which is very painful," that it had been recommended that surgery await clearance from a cardiologist, and that

5

Plaintiff was now cleared by the cardiologist for surgery. Id. Dr. Gaddy examined Plaintiff on August 19, 2003, and noted "diastasis of the rectus abdominus." He also noted Plaintiff's orthopedic and heart problems, stated that the results of Plaintiff's stress test were not in the computer, and recommended that Plaintiff be returned to Dr. Rakestraw for evaluation so that "a uniform approach be made to therapy." Id.

The record indicates that approximately three years later, on July 11, 2006, Dr. Gaddy again saw Plaintiff for the abdominal problem. Dr. Gaddy noted that he had never been successful with surgical repair of the kind of hernia he thought Plaintiff had, with recurrence being usual. Dr. Gaddy, however, thought that new surgical techniques might be an option, and he recommended that a second opinion and follow-up be pursued with surgeon Carl Doerhoff, M.D. Id. Progress notes by Dr. Doerhoff dated August 9, 2006, reported that on physical examination, Plaintiff had a "large rectus diastasis," but no ventral hernia. Dr. Doerhoff opined that Plaintiff's condition should be completely asymptomatic and cause no discomfort, and that if Plaintiff had abdominal discomfort, he should be evaluated for another source. Dr. Doerhoff listed Plaintiff's numerous medical problems, and opined that Plaintiff needed no surgery.[3]

Defendants both argue that the record now before the Court establishes at most a disagreement about proper treatment of Plaintiff's shoulder and abdominal problems, which does not constitute a constitutional violation. They also argue that they are entitled

---

[3] The Court notes that Dr. Doerhoff made no mention of any injury to Plaintiff's shoulders.

to summary judgment on the basis of qualified immunity.

In opposition to the motions for summary judgment, Plaintiff concedes that his claims against Dr. Gaddy pertain solely to the Plaintiff's abdominal condition. Plaintiff has submitted the report of his medical expert, Garth Russell, M.D. In the report, dated May 26, 2007, Dr. Russell evaluated Plaintiff's current medical condition based upon his examination of Plaintiff, and reviewed the history of Plaintiff's medical treatment while at NECC. Dr. Russell diagnosed Plaintiff with torn rotator cuffs, bilaterally; rectus diastasis with large herniation; and chronic trochanteric bursitis of the left hip. Dr. Russell reported that examination of Plaintiff's shoulders showed some atrophy within the trapezius muscle, some adhesive capsulitis in the right shoulder, loss of abduction activity above 90 degrees, some loss of extension and flexion, and difficulty in bringing his hands together above his head. Dr. Russell wrote that Plaintiff currently had "significant functional deficit in the rotator cuff on his shoulders bilaterally." Examination also revealed that Plaintiff had a "large abdominal hernia secondary to diastasis of the abdominal muscle." (Pl. Ex. E .)

Dr. Russell opined that Plaintiff received inadequate follow-up with respect to his rotator cuff injuries, in that following treatment of his hip, no further appointments were made with Dr. Galbraith and no further treatment was given. Dr. Russell wrote, however, that his report

> does not address . . . whether surgical intervention, physical therapy or other treatment should have been instituted, but is solely addressing the issue of administrative supervision of this patient's medical condition and decisions made in a reasonable amount of time. This pertains to: (1) rotator cuff injuries to his shoulders bilaterally; (2) to the adequacy of supervision

and length of time for physical therapy for his hips and/or shoulders; (3) an investigation and final decision as to the diagnosis and treatment of his abdominal hernia.

Id. Dr. Russell concluded his report as follows: "This report does not address the indications or proper medical management and treatment for these conditions, but it is the opinion of this examiner that the supervision follow-up and treatment in a reasonable timeframe was outside the accepted standard of medical care."

Plaintiff argues that this report, together with the evidence in the medical record that Plaintiff had been medically cleared for both surgeries, creates material fact questions as to the adequacy of the medical care provided by Defendants for his shoulder and abdominal problems, precluding the entry of summary judgment on the two remaining matters. Plaintiff also points to the February 24, 2003 reference in the medical records that new orders were needed for two weeks of additional physical therapy for Plaintiff's hip, orders which Dr. Rakestraw never provided.

## **DISCUSSION**

### **Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, a court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the record. Davis v. Hall, 375 F.3d 703, 711

8

(8th Cir. 2004); Hott v. Hennepin County, Minn., 260 F.3d 901, 904 (8th Cir. 2001).

The moving party bears the burden of showing the absence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A "material" fact is one "that might affect the outcome of the suit under the governing law." Id. at 248. When a motion for summary judgment is made and properly supported by evidence, the non-moving party may not rest on the allegations of his pleadings, but must set forth specific facts, by affidavit or other evidence, showing that there is "a genuine issue for trial." Fed. R. Civ. P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

**Prisoner's Right to Adequate Medical Care**

Corrections officials are obligated under the Eighth Amendment's prohibition of cruel and unusual punishment, to provide inmates with proper medical care. Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006). To establish an Eighth Amendment violation by a prison doctor, a prisoner must show that the doctor was deliberately indifferent to the prisoner's serious medical needs, that is, that the doctor "knew of, yet disregarded, an excessive risk to [the prisoner's] health." Logan v. Clarke, 119 F.3d 647, 649 (8th Cir. 1997). Thus, to survive summary judgment, the prisoner must show "more than negligence, more even than gross negligence." Alberson, 458 F.3d at 766 (citation omitted). The inmate must also show more than a disagreement with treatment decisions. Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006); Jolly v. Knudsen, 205 F.3d 1094,

9

1096 (8th Cir. 2000). An intent to harm need not be shown. Moore v. Duffy, 255 F.3d 543, 544 (8th Cir. 2001). "Intentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention or the actions of the officers are so dangerous that a knowledge of the risk may be presumed." Gordon ex rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006) (citing Plemmons v. Roberts, 439 F.3d 818, 823 (8th Cir. 2006)); see also Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) (holding that deliberate indifference may be manifested by prison officials intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment) (citing Estelle v. Gamble, 429 U.S. 97, 104-05) (1976)).

Here, Plaintiff's expert, Dr. Russell, does not provide any evidentiary support for Plaintiff's claims that Drs. Rakestraw and/or Gaddy provided inadequate medical treatment for Plaintiff's abdominal condition and shoulders. As noted above, Dr. Russell states that his report "does not address the fact that as to whether surgical intervention, physical therapy or other treatment should have been instituted . . . ." (Pl. Ex. D at 22.) The only area in which Dr. Russell found Defendants deficient was in their follow-up of these conditions, not in the actual treatment provided.

There is no support in the record for the contention that Dr. Rakestraw's assessment that Plaintiff never met Dr. Galbraith's conditions for shoulder surgery constituted deliberate indifference to Plaintiff's serious medical needs. No physician, including Plaintiff's own expert, ever opined that shoulder surgery was necessary, and the fact that other physicians believed that Plaintiff's heart condition and hip condition did

not preclude surgery does not establish that the surgery was needed. Furthermore, the record supports Dr. Rakestraw's assertion that Plaintiff did not continue to complain about his shoulder problems.

Dr. Gaddy's assessment that surgery for Plaintiff's abdominal problem was not a good solution was supported by Dr. Doerhoff's opinion that surgery was not called for. Again, the fact that the cardiologist believed that Plaintiff could withstand surgery does not establish that failure to provide the surgery constituted inadequate medical care. And again, Plaintiff's own expert did not opine that abdominal surgery should have been performed, or that treatment for this condition was inadequate. Dr. Rakestraw's failure to issue orders at the end of February 2003 for an additional two weeks of physical therapy twice a week for Plaintiff's hip problems does not support a constitutional claim for deliberate indifference to a serious medical need.

In sum, upon review of the record now before the Court, the Court concludes that taking the facts in the light most favorable to Plaintiff, no reasonable juror could find that Defendants were deliberately indifferent to any of Plaintiff's serious medical needs. See, e.g., Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1118-19 (8th Cir. 2007) (stating that a prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of deliberate indifference to prisoner's serious medical needs under the Eighth Amendment; in the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, a prisoner cannot create a question of fact by merely stating that he did not feel he received adequate treatment) (citations omitted).

As noted above, Defendants contend that they are entitled to qualified immunity on Plaintiff's remaining claims. However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the Defendants' motions for summary judgment are **GRANTED**. [Doc #73 & Doc. #94]

All claims against all parties having been resolved, a separate Judgment shall accompany this Memorandum and Order.

                                                            _Audrey G. Fleissig_
                                                            AUDREY G. FLEISSIG
                                                            UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of November, 2007.